KEYSTONE BRASS WORKS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 16300. Promulgated April 22, 1949.

*Enoch C. Filer, Esq.,* for the petitioner.
*A. W. Dickinson, Esq.,* for the respondent.

624

## OPINION.

Van Fossan, *Judge*: The issue before us is whether or not the petitioner may be granted the benefit of section 721 (a) (2) (C) of the Internal Revenue Code [1] because it had abnormal income in the taxable year, of the class set forth in that section, attributable to prior years.[2]

The picture presented is that of a small but efficient manufacturer of plumbing fittings called upon to produce bronze bushings for Rolls-Royce aircraft engines—under specifications and requirements theretofore wholly unknown to the petitioner. That the new and untried field of operation demanded much experimentation and development can not be gainsaid. Going beyond the range of its previous experience and knowledge and the scope of its contemporaneous advice, suggestions, and instructions, the petitioner was forced to overcome, by exploration, trial, and research, currently considered impossible obstacles in order to produce the articles required by Packard and demanded by the exacting specifications of the English designed aircraft engine.

The three most important requirements imposed by Packard were (1) an extraordinary degree of hardness, (2) chilled castings by the permanent mold method, and (3) a finish tolerance limited to 15 millionths of an inch in mean depth. Later, the problems of mold coating

---

[1] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purpose of this section—

(1) ABNORMAL INCOME.—The term "abnormal income" means income of any class includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 125 per centum of the average amount of the gross income of the same class for the four previous taxable years, or, if the taxpayer was not in existence for four previous taxable years, the taxable years during which the taxpayer was in existence.

(2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income:

\* \* \* \* \* \*

(C) Income resulting from exploration, discovery, prospecting, research, or development of tangible property, patents, formulae, or processes, or any combination of the foregoing, extending over a period of more than 12 months; \* \* \*

[2] (b) AMOUNT ATTRIBUTABLE TO OTHER YEARS.—The amount of the net abnormal income that is attributable to any previous or future taxable year or years shall be determined under regulations prescribed by the Commissioner with the approval of the Secretary. In the case of amounts otherwise attributable to future taxable years, if the taxpayer either transfers substantially all its properties or distributes any property in complete liquidation, then there shall be attributed to the first taxable year in which such transfer or distribution occurs (or if such year is previous to the taxable year in which the abnormal income is includible in gross income, to such latter taxable year) all amounts so attributable to future taxable years not included in the gross income of a previous taxable year.

and centrifugal casting complicated the situation and their solution required further research, experimentation and development. There were no methods of manufacture known to the petitioner or obtainable by it whereby it could meet such unusual exactness and precision of construction. Consequently, new processes, new equipment, and new techniques had to be developed in usable form to accomplish the desired result.

At the outset, we must keep in mind the fact that the petitioner's operations during the years under consideration were confined within very narrow limits. It had abandoned entirely its normal manufacture of plumbing fittings and was undertaking a new, unfamiliar, and untried procedure, consisting of the production of a particular type of bushing to be used in the Rolls-Royce aircraft engine, which was being built by only one manufacturer, Packard. The petitioner was confronted by a blank wall of inexperience in the peculiar new art which was to be responsible for the creation of the needed bushing, and was challenged by precisely the kind of necessity which has so often been the mother of American invention.

The record reveals clearly that the statutory and the regulatory requirements have been met by the petitioner. The research and development required to perfect the process of manufacture extended over a period of considerably more than twelve months. The petitioner's abnormal income in 1944 was not the result of increased prices, low operating costs, decreased competition, or improvement in business conditions.

The respondent quotes from *Soabar Co.*, 7 T. C. 89, to the effect that the two major purposes of enacting the excess profits legislation were to provide additional revenue and to prevent the creation of war millionaires, and emphasizes the following excerpt:

* * * Congress anticipated that business for many taxpayers would improve because of external changes and it intended the tax to apply in those cases. It also realized that there might be some instances in which the income of the base period years might not satisfactorily reflect internal changes in the business. That is, there might be cases in which the increase in profits of the tax year over those of the base years might be attributed, at least in part, to internal changes and development of a particular business or some phase of that business to its full stature and to that extent would not be attributable to the outside business stimulus. * * *

and then concludes:

Viewing section 721 (b) in the light of the foregoing, it would seem that Congress intended to extend relief only when the abnormal income described in section 721 (a) (2) (C) constituted the fruition of the initiative and enterprise of the taxpayer in engaging in original research and development.

In our opinion, both the excerpt and the respondent's conclusion fit precisely the facts in the case at bar. The law does not mean that an

article itself must be an entirely new product, but it may be a new type of the article or an improvement therein which necessitates original research and development of tangible property and the processes of manufacture, and which results in the abnormal income defined in section 721 (a) (1).. See *W. B. Knight Machinery Co.*, 6 T. C. 519; *Rochester Button Co.*, 7 T. C. 529.

The respondent treats the record as showing that the petitioner merely "adapted" its plant to wartime requirements. The Defense Plant Corporation provided certain standard machinery needed for bushing manufacture, but the petitioner invented, designed, and developed particular equipment essential to its research, experimentation, and production, such as molds, tools, dies, casting machines, and special furnaces. Such equipment bore no relation whatever to the petitioner's prewar activities. Due to Government restrictions and prohibitions, the petitioner was compelled to abandon its normal business. Fortunately for it, it secured from Packard the opportunity to develop the needed bushing. Here, as in *W. B. Knight Machinery Co.*, *supra*, the work of experimenting and developing constituted a radical departure from the art and methods of manufacture employed by petitioner theretofore, and it thus produced a new and different product having little or no relation to its old products.

However, the income derived in 1944 from the sale of the bushings was not the result in its entirety from research or development, as contended by petitioner. Some part of such income was due to efficient management and the skillful use of machinery in the plant, as well as the use of new machinery and equipment acquired by petitioner without which it could not have produced the quantity produced in 1944. *Ramsey Accessories Mfg. Corporation*, 10 T. C. 482. Some part of such income is also due to increased demand. It is true that petitioner received orders for a greater number of bushings in 1942 than in 1944, but more than one-half in number of bushings of the 1942 orders were canceled in 1943 due, in part, to a reduction in demand for spare parts. The number of bushings ordered in 1944 was substantially in excess of the number ordered in 1943. It is to be noted, too, that the number of engines manufactured by Packard was greatly in excess of the number manufactured in prior years. Therefore, a certain portion of the income derived from the sale of bushings does not come within the intendment of the statute. *Eitel-McCullough, Inc.*, 9 T. C. 1132.

The period of research and development extended into 1944. This is conceded by petitioner, for it allocated $68,894.59 of its net abnormal income as computed by it to 1944. The respondent argues that, although petitioner kept a record as to materials and labor which went into the bushings, there was no breakdown in such records of materials,

labor, manufacturing, and overhead as between research or development and production, and that, therefore, petitioner, in attempting to sustain its burden of establishing its net abnormal income and the amount thereof attributable to prior years, was "forced to indulge in reconstruction based on estimates." He does not suggest that the estimates or reconstruction were unreasonable or without basis. As stated in *Rochester Button Co., supra*, "it is easy to understand that a taxpayer's books are not kept with prophetic vision as to the future requirements of income tax legislation." Here, as in that case, "the burden of going forward with any possible contradictory material reasonably fell upon respondent."

We have observed that it is difficult to make precise allocation of amounts of income attributable to various factors or periods. *Ramsey Accessories Mfg. Corporation, supra*. After considering all the evidence, it is our conclusion that petitioner's net abnormal income for the year 1944 is attributable to the extent of $68,360.65 to 1943 and $3,978.66 to 1942, and we have so found.

Reviewed by the Special Division.

> *Decision with respect to excess profits tax liability for 1944 will be entered under Rule 50.*